| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* RAJU A.T. DAHLSTROM, <br><br> STATE OF WASHINGTON, *ex rel.* RAJU A.T. DAHLSTROM, <br><br> Plaintiffs, <br> v. <br><br> SAUK-SUIATTLE INDIAN TRIBE OF WASHINGTON, et al., <br><br> Defendants. | CASE NO. C16-0052JLR <br><br> ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTIONS IN LIMINE AS MOOT |

//

//

//

//

//

# I.   INTRODUCTION

Before the court are:  (1) Defendants Christine Marie Jody Morlock, Robert Larry Morlock, and Ronda Kay Metcalf's (collectively, "Individual Defendants") motion for summary judgment (MSJ (Dkt. # 64)), and (2) Individual Defendants' motions in limine (MIL (Dkt. # 77)).  The court has reviewed the summary judgment motion, the parties' submissions in support of and in opposition to the motion, the relevant portions of the record, and the applicable law.  Being fully advised,[1] the court GRANTS Individual Defendants' summary judgment motion and DISMISSES this action WITH PREJUDICE.  In light of this ruling, the court DENIES Individual Defendants' motions in limine as MOOT.

//

//

---

[1] Mr. Dahlstrom requests oral argument.  (*See* Resp. (Dkt. # 72) at 1.)  The general rule is that the court should not deny a request for oral argument made by a party opposing a motion for summary judgment unless the motion is denied.  *See Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964).  However, a district court's denial of a request for oral argument on summary judgment does not constitute reversible error in the absence of prejudice.  *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (citing *Fernhoff v. Tahoe Reg'l Planning Agency*, 803 F.2d 979, 983 (9th Cir. 1986)).  There is no prejudice in refusing to grant oral argument where the parties have ample opportunity to develop their legal and factual arguments through written submissions to the court.  *Id.* ("When a party has an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument] . . . .") (quoting *Lake at L.V. Inv'rs Grp., Inc. v. Pac. Malibu Dev. Corp*., 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*).  Mr. Dahlstrom provided the court with lengthy written submissions in support of his opposition to Individual Defendants' summary judgment motion.  (*See* Resp.; Waszak Decl. (Dkt. # 70); Pope Decl. (Dkt. # 71) (attaching over 680 pages of exhibits); Dahlstrom Decl. (Dkt. # 74) (attaching over 900 pages of exhibits).)  The court concludes that—given Mr. Dahlstrom's extensive written submissions—he suffers no prejudice in the absence of oral argument.  The court also concludes that oral argument would not be of assistance in deciding the motion.  *See* Local Rules W.D. Wash. LCR 7(b)(4).  Accordingly, the court DENIES Mr. Dahlstrom's request for oral argument.

## II.    BACKGROUND

**A.    Mr. Dahlstrom's Employment with the Tribe**

Mr. Dahlstrom was initially hired as a social worker for Defendant Sauk-Suiattle Indian Tribe of Washington's ("the Tribe") Indian Child Welfare Department in 2010. (6/6/19 Nedderman Decl. (Dkt. # 67) ¶ 2, Ex. 1.)  Mr. Dahlstrom became the Director of the Department in 2011.  (*Id.* ¶ 3, Ex. 2.)  On April 30, 2015, the Tribe appointed Mr. Dahlstrom interim Health and Social Services ("HSS") Director.  (*Id.* ¶ 4, Ex. 3.)  In July 2015, the Tribe appointed him HSS Director.  (*Id.* ¶ 5, Ex. 4.)  As an at-will employee, Mr. Dahlstrom acknowledged that the Tribe "may terminate [his] employment at any time, with or without cause."  (*Id.* ¶ 6, Ex. 5.)  The Tribe placed Mr. Dahlstrom on administrative leave with pay in October 2015.  (*Id.* ¶ 7, Ex. 6.)  The Tribal Counsel terminated his employment without cause on December 4, 2015.  (*Id.* ¶ 8, Ex. 7; *see also* Metcalf Decl. (Dkt. # 66) ¶ 2.)  Mr. Dahlstrom received a letter confirming his termination on December 8, 2015.  (6/6/19 Nedderman Decl. ¶ 9, Ex. 8.)

**B.    This Lawsuit**

Plaintiffs United States of America, *ex rel.* Raju A.T. Dahlstrom and State of Washington, *ex rel.* Raju A.T. Dahlstrom (collectively, "Mr. Dahlstrom") filed this *qui tam* lawsuit on January 12, 2016, approximately one month after he was terminated.  (*See* Compl. (Dkt. # 1).)  Mr. Dahlstrom asserts claims under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and the Washington Medicaid Fraud False Claims Act ("the Washington Medicaid Fraud FCA"), RCW ch. 74.66.  (*See* Compl. ¶¶ 71-82.)  He also brings claims for FCA retaliation and Washington Medicaid Fraud FCA

retaliation.[2] (*See id.* ¶¶ 92-95.)  On September 26, 2016, both the United States and the State of Washington opted not to intervene in this suit.  (Not. Declining Intervention (Dkt. # 8).)  On September 28, 2016, the court unsealed the pleadings.  (9/28/16 Order (Dkt. # 9).)  The court later dismissed Mr. Dahlstrom's claims against the Tribe on grounds of sovereign immunity but permitted Mr. Dahlstrom's claims against Individual Defendants to proceed.  (*See generally* 3/21/17 Order.)

**C.    Alleged False Claims**

Although Mr. Dahlstrom's complaint and other filings are often confusing and difficult to follow, the parties implicitly agree that he raises seven alleged false claims in this lawsuit.  (*See* MSJ at 4 ("[D]efendants believe that there are only seven alleged false claims in this lawsuit."); Resp. at 10-16 (responding to the seven alleged false claims in Defendants' motion for summary judgment and failing to identify any additional alleged false claims).)[3]  The court recounts the relevant facts with respect to each such claim in the analysis section below.  The court now considers Individual Defendants' motion for summary judgment on all of Mr. Dahlstrom's claims.

---

[2] Mr. Dahlstrom also brought claims for declaratory and injunctive relief and breach of contract against the Tribe only.  (*See* Compl. ¶¶ 83-88.)

[3] To the extent that there are other alleged false claims hidden in Mr. Dahlstrom's complaint, which Mr. Dahlstrom did not identify in response to Individual Defendants' summary judgment motion, the court declines to consider those claims now, and dismisses them.  *See Dahlstrom v. United States*, No. C16-1874RSL, 2019 WL 1514212, at *2 (W.D. Wash. Apr. 8, 2019), *reconsideration denied*, No. C16-1874RSL, 2019 WL 1979312 (W.D. Wash. May 3, 2019) (dismissing "other hidden claims" in Mr. Dahlstrom's complaint for wrongful discharge against Individual Defendants and others); *see also Muhareb v. Lowe's HIW, Inc.*, No. EDCV1201290VAPOPX, 2012 WL 12892156, at *4 (C.D. Cal. Oct. 25, 2012) ("Judges are not like pigs, hunting for truffles buried in [pleadings].") (alteration in original) (quoting *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994)).

# III.   ANALYSIS

## A.   Summary Judgment Standard

Summary judgment is proper when the pleadings, discovery, and other materials on file, including any affidavits or declarations, show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005).  To satisfy its burden at summary judgment, a moving party with the burden of persuasion "must establish beyond controversy every essential element of its . . . claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotation marks and citation omitted).  By contrast, a moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000) (citing *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990)).  "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, *specific facts* showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and

quotation marks omitted) (citing, among other cases, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 (1986)).

"A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In addition, the evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e); *see also Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992) (to survive summary judgment, the non-moving party "ordinarily must furnish affidavits containing admissible evidence tending to show the existence of a genuine dispute of material fact"). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). With that said, courts do not make credibility determinations or weigh conflicting evidence at the summary judgment stage and must view all evidence and draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Motley v. Parks*, 432 F.3d 1072, 1075, n.1 (9th Cir. 2005) (en banc).

**B.     Preliminary Matters**

Although presently represented by counsel, Mr. Dahlstrom's 43-page *qui tam* complaint was initially filed *pro se*. [4]  (*See* Compl.)  His complaint contains a maze of

---

[4] Mr. Dahlstrom filed this action on January 12, 2016.  (*See* Compl.)  On January 22, 2016, the court issued an order to show cause why the matter should not be dismissed because

disjointed factual allegations, numerous related and unrelated legal and factual tangents, and many pages of legal citations and explanations.[5]  (*See generally id.*)  Once he obtained representation, Mr. Dahlstrom's filings did not significantly improve.  (*See generally* Dkt.)  For example, his responsive memorandum is nearly as difficult to follow as his complaint.  (*Compare* Resp. *with* Compl.)  Further, his responsive memorandum violates the court's rules concerning formatting, and accordingly, it also violates the court's rules governing the length of briefs.  *See infra* n.12, n.16; *see also* Local Rules W.D. Wash. LCR 7(e), 10(a).  More significantly, Mr. Dahlstrom's citations to the record are often in error or simply refer the court to conclusory allegations made in his own declaration or to other irrelevant or inadmissible evidence.  *See infra* § III.C.4-5; n.12; (*see generally* Resp.)  Indeed, Mr. Dahlstrom filed over 1,700 pages of declarations and accompanying exhibits in opposition to Individual Defendants' motion.  (*See* Waszak Decl.; Pope Decl.; Dahlstrom Decl.)  Yet, he cites to only a small portion of any of these documents in his responsive memorandum, and as noted above, many of these citations are in error.  (*See generally* Resp.); *see also infra* § III.C.4-5; n.12.

"[I]t is not . . . [the] task . . . of the district court . . . to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

//

the FCA does not authorize a realtor to prosecute a 31 U.S.C. § 3729 violation *pro se*.  (*See* OSC (Dkt. # 2).)  On February 18, 2016, attorney Richard Lamar Pope, Jr. filed a notice of appearance on behalf of Mr. Dahlstrom.  (Not. of Appearance (Dkt. # 3).)

[5] Defendants moved to dismiss Mr. Dahlstrom's complaint on grounds of sovereign immunity but they did not move to dismiss his complaint based on inadequate factual pleading.  (*See* MTD (Dkt. # 13); *see also* 3/21/17 Order.)

(quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir.1995)); *see also*

*Greenwood*, 28 F.3d at 977 (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.

1991)) ("Judges are not like pigs, hunting for truffles buried in briefs.").  The court

"rel[ies] on the nonmoving party to identify with reasonable particularity the evidence

that precludes summary judgment."  *Keenan*, 91 F.3d at 1279; *see also Californians for*

*Renewable Energy v. Cal. Pub. Utilities Comm'n*, 922 F.3d 929, 936 (9th Cir. 2019).

Factual citations in a party's brief should identify the evidence that will create a triable

issue.  Instead, as noted above, many of Mr. Dahlstrom's citations direct the court to a

portion or page of the record that provides little or no support for the cited proposition in

his memorandum.  In this respect, his responsive memorandum "obfuscate[s] rather than

promote[s] an understanding of the facts" and undermines rather than supports the

proposition that there are genuine, triable, material factual disputes.  *Keenan*, 91 F.3d at

251.  To the extent that Mr. Dahlstrom's responsive memorandum fails to cite evidence

in his voluminous and meandering factual filings that demonstrates a material factual

dispute for trial, the court will not search for such a dispute here.

**C.     FCA Claims**

        The FCA makes liable anyone who "knowingly presents, or causes to be

presented, a false or fraudulent claim for payment or approval," or "knowingly makes,

uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (B).  A "claim" includes a direct request

for government payment as well as a reimbursement request made to the recipients of

federal funds under a federal benefits program.  31 U.S.C. § 3729(b)(2)(A); *Universal*

*Health Servs., Inc. v. United States (Escobar)*, --- U.S. ---, 136 S. Ct. 1989, 1996 (2016). "A claim under the [FCA] requires a showing of '(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'" *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (quoting *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006)).

Significantly, it is not enough to allege regulatory violations, *id.* (citing *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)); nor "a private scheme," without evidence of a claim requesting illegal payments, *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002). Rather, the plaintiff "must establish that a false claim was submitted to the government." *Id.* Indeed, "the false claim or statement must be the '*sine qua non* of receipt of state funding.'" *Campie*, 862 F.3d at 898-99 (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).

As to the knowledge element, a defendant acts knowingly if it has actual knowledge, deliberate ignorance of the statement, or reckless disregard as to the truth of the statement. 31 U.S.C. § 3729(b)(1). "Innocent mistakes, mere negligent misrepresentations and differences in interpretations" do not constitute knowingly false statements. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996).

"A failure to raise a triable issue of fact as to any of these . . . elements justifies the summary judgment dismissal of [the relator's] claims." *Kitsap Physicians Serv.*, 314 F.3d at 1000 (citing *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1477-79 (9th

Cir. 1996)).  Although his claims and arguments are at times confusing and difficult to

follow, the court endeavors to understand and then address each of Mr. Dahlstrom's

asserted FCA claims.

      1.    <u>False Claim 1—Alleged Transfer of Properties</u>

      Mr. Dahlstrom alleges that the Tribe "purchased properties, in excess of

$500,000[.00]," and "transferred real properties to various persons or agents of the . . .

Tribe in contravention of the IRA-process[6] approved for bringing fee-land into

trust-land."  (Compl. ¶ 16(a) (footnote added); *see also id.* ¶¶ 75-82.)  In his deposition,

Mr. Dahlstrom testified that this claim applies to Ms. Metcalf but not to Dr. Morlock or

Mr. Morlock.  (6/6/19 Nedderman Decl. (Dkt. # 67) ¶ 14, Ex. 13 ("Dahlstrom Dep.")[7] at

133:25-134:2, 479:20-480:4.)  When asked to describe Ms. Metcalf's involvement, Mr.

Dahlstrom stated that it was his understanding that she was "the spokesperson and the

signer on behalf of the council [for] . . . these transactions."  (*Id.* at 480:8-10.)  When

pressed for specific evidence of wrongdoing by Ms. Metcalf, Mr. Dahlstrom stated in his

deposition that she "served as both general manager . . . [and] was also a voting member

on the council" so that she could "either halt the fraud or . . . perpetuate it."  (*Id.* at

480:18-22.)  Mr. Dahlstrom offers no other material evidence.

//

//

---

[6] *See* Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 5101-29.

[7] Portions of Mr. Dahlstrom's deposition appear at another place in the record.  (*See* 7/17/19 Nedderman Decl. (Dkt. # 76) ¶ 2, Ex. 1.)  Irrespective of where Mr. Dahlstrom's deposition appears in the record, the court will cite to it as "Dahlstrom Dep."

The gravamen of Mr. Dahlstrom's claim is that the tribe "was involved in purchasing properties under false reasons – specifically, to use federal dollars to leverage purchases of the properties without intending to use those purchased properties for advertised or expressed use." (6/6/19 Nedderman Decl. ¶ 17, Ex. 15 at 41.) Mr. Dahlstrom states that the Tribe advertised using the properties for children's therapeutic programs and other services, and that he was "invited . . . to assist in the development of effective strategies for securing these properties," but "was completed [sic] shut out of this process and left in the dark as to the real intentions for the foregoing properties." (*Id.* at 42.)

However, during his deposition, Mr. Dahlstrom admitted that—as far has he knows—the Tribe never went forward with its application to the State of Washington concerning these properties. Specifically, he testified:

> Yeah, there were two different properties. I was told that it was for the use of children – for children and for therapy and for all sorts of programs. . . . [A]nd that was initially what I was told was going to happen. Now, whether or not its full implementation ever occurred, I don't know because I'm no longer there, so I don't know. All I know is that there was some pretense that this is what it was about, but as far as I know, the program, at least while I was still there, was never allowed to get off the ground. There were representations made to the State of Washington, through my office, that I had been directed by the council to produce a program. We provided application for consideration and everything. And then . . . The – only then for all of that to come crumbling to the ground because Ms. Metcalf told me we weren't going forward with it.

(Dahlstrom Dep. at 122:9-123:3.) Indeed, Mr. Dahlstrom acknowledged that he knows very little about the transaction at all:

> Q: . . . Do you have any personal knowledge what specific funds were used . . . for the purchase of these properties?

A: The only thing I know is what [a Council member] described to me. He said the tribe gave him cash and he was supposed to go and approach the purchasing of all this. So how that – how that happened in terms of whether he was a front person for providing the cash to buy property on moneys that belonged to the tribe, whether it was through federal contracts or moneys from the State or from a private enterprise or from tribal resources, a casino, receipts, I don't know, all I know is that [the council member] said the monies were pulled out of the bank and handed to him, and in the form of a payment that he was supposed to handle privately.

**********

Q: But do you know who purchased [the properties], whether it was a tribe or a private individual, do you know?
A: I never saw the documents.

**********

Q: Okay. But you don't know if, specifically, whether any federal funds were used to purchase this property; is that correct?
A: I know that [a Council member] told me that they removed money from the bank where our contracts and grants were kept.

**********

Q: [M]y question to you is: Do you have any evidence that a single federal dollar was used to purchase that property?
A: The only evidence that I have is that [a Council member] indicated to me that the moneys were coming from the Coastal Bank where the federal dollars and grant moneys are, and that's the only reference point I have.

**********

Q: . . . [O]ther than what [the Council member] told you, that he purchased those properties from some source, you have no evidence that any federal funds were used to purchase those properties; is that correct? It's a yes or no question.
A: Well, it's not that simple because I don't have discovery, but based on – based on what I know at the time, his representations were that he was given money to purchase property and it came out of Coastal Bank where the tribal grants and contract money is stored.
Q: That's the only information you have?
A: That – for right now, yes.

(*Id.* at 126:24-127:13, 127:21-23, 129:11-16, 131:21-132:2, 133:9-21.)

*//*

Mr. Dahlstrom's lack of knowledge concerning the transaction is unsurprising because, as the Tribe's Health and Social Services Director, he was not involved in the purchase of any land. (Metcalf Decl. (Dkt. # 66) ¶ 3.) Ms. Metcalf, as the Tribe's General Manager, testifies that the Tribe has not used either grant or contract money to purchase property since at least 2005—well before the allegations Mr. Dahlstrom makes in his complaint occurred. (*See id.*; *see also* Compl. at 8-9; *see also* Resp. at 10 (describing the period for this claim as "2014-2015").)

However, in response to Individual Defendants' motion for summary judgment, Mr. Dahlstrom's claim changed. He now claims that federal Indian Self-Determination and Education Assistance Act of 1975 ("ISDEAA") funds were "leveraged" to purchase certain properties on behalf of the Tribe. (Resp. at 10.) The sole evidence he offers in support of this new theory is his declaration testimony in which he asserts that a tribal employee "advised [him] that [the tribal employee] was concerned having made this purchase after [General Manager] Metcalf's approval to use or leverage ***ISDEAA funds*** as back-up collateral for purchasing of the Healing Lodge -properties." (Dahlstrom Decl. (Dkt. # 73) ¶ 34 (bolding and italics in original).)

First, the court will not allow Mr. Dahlstrom to inject a new theory of liability in response to Individual Defendants' motion for summary judgment. Mr. Dahlstrom did not plead the leveraging of ISDEAA funds in his complaint. (*See* Compl. ¶ 16(a) ("The . . . Tribe purchased properties, in excess of $ 500,000; transferred real properties to various persons or agents of the . . . Tribe in contravention of the IRA -process approved for bringing fee-land into trust-land.").) He raised this theory for the first time in his

summary judgment response and his declaration. (*See* Resp. at 10 (citing Dahlstrom Decl. ¶ 34).) Federal Rule of Civil Procedure 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The Ninth Circuit has explained that where "the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079-80 (9th Cir. 2008). Similarly, in *Coleman v. Quaker Oats Co.*, where the plaintiff attempted to raise a new theory at summary judgment that was not pled in the complaint or raised during discovery, the Ninth Circuit held that allowing the plaintiff to do so "would prejudice the defendant by forcing them to develop entirely new defenses that were not explored through discovery." 232 F.3d 1271, 1292 (9th Cir. 2000); *see also Smith v. City & Cty. of Honolulu*, 887 F.3d 944, 951-52 (9th Cir. 2018) (relying on *Coleman*). Accordingly, the court GRANTS Individual Defendants' motion for summary judgment concerning the alleged leveraging of ISDEAA funds to purchase certain properties for the Tribe.

With respect to Mr. Dahlstrom's initial allegations concerning the purchase or transfer of tribal lands, he fails to identify any false claim made to the government. *See Kitsap Physicians Serv.*, 314 F.3d at 1002 (stating that the plaintiff "must establish that a false claim was submitted to the government"). Although Mr. Dahlstrom claims that someone obtained or "leveraged" federal money under false pretenses, his only evidence that the source of the funds was federal is that the money was removed "from the bank where [the Tribe's] contracts and grants were kept." (Dahlstrom Dep. at 129:11-16.) Mr.

Dahlstrom's failure to identify a claim made to the government and to support the claim with competent evidence is "fatal to his action." *See Kitsap Physicians Serv.*, 314 F.3d at 1003.

The court notes that Mr. Dahlstrom's responsive memorandum also raises the possibility of FCA liability under "an implied false certification" theory. (*See* Resp. at 19-21.) To establish falsity required to support a FCA claim under an implied false certification theory, Mr. Dahlstrom must establish that the defendant does not merely request payment, but also makes specific representation about the goods or services provided, and that the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths. *See United States Ex Rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1018 (9th Cir. 2018) (citing *Escobar*, 136 S. Ct. at 2001). Mr. Dahlstrom, however, fails to present any evidence that Defendants (1) submitted claims for payment with "specific representations" relevant to this case, and (2) failed to disclose noncompliance with material statutory, regulatory, or contractual requirements that made those representations misleading half-truths. *See id.* Indeed, he has not even specifically identified a claim for payment as to any of his claims; nor has he cited a law or rule "necessarily implicated" in such a claim. *See id.* at 1017-18. Further, he fails to demonstrate with competent evidence that Defendants were not in compliance with any law or rule or that such non-compliance was material. *See id.* Accordingly, the court GRANTS Individual Defendants' motion for summary judgment on the entirety of this claim concerning the alleged transfer of properties.

2. <u>False Claim 2—Loan Repayment Obligations</u>

Mr. Dahlstrom contends that Dr. Morlock "facilitated an application with the Loan Repayment Program [("LPR")] in order to retire over three-hundred thousand in student loan debts from the [Department of Health and Human Services]/Indian Health Services." (Compl. ¶ 16(b).) Mr. Dahlstrom's initial allegations concerning this asserted false claim were two-fold. First, he believed Dr. Morlock was ineligible for LPR because "Indian Health Services' site-score cards do not include the recruitment of Naturopathic doctor." (*Id.*) During his deposition, Mr. Dahlstrom stated that his "understanding [was] that there was never an authorization to alter the [federal funding] contract to indicate that a naturopathic practitioner was now approved under those federal dollars." (Dahlstrom Dep. at 193:4-7.) However, he admitted that "the general manager and the Council" would have had the authority to alter the contract. (*Id.* at 193:8-14.)

In contravention to Mr. Dahlstrom's "understanding," Ms. Metcalf, the general manager, declares that she received approval from Indian Health Services for Dr. Morlock to practice naturopathic medicine for the Tribe. (Metcalf Decl. ¶ 4.) Mr. Dahlstrom admits he was not informed of such authorization, although he asserts that he "would have been made aware that she was approved." (Dahlstrom Dep. at 193:15-25.) He further admits that he lacks any documentation regarding whether Dr. Morlock ever received federal funding from the LPR. (*Id.* at 188:20-24.)

Second, Mr. Dahlstrom believed that Dr. Morlock did not satisfy an apparent 85-percent threshold for patient care and management, which he avers is needed to qualify for LRP. (*See id.* at 153:17-156:10.) Mr. Dahlstrom concluded that Dr.

Morlock's 85-percent attestation "was not credible" based solely off his periodic check of patient sign in sheets and "patient flow information" from 2015. (*Id.* at 429:16-431:2.)

On the other hand, Dr. Morlock declares that she was eligible for LRP (C. Morlock Decl. (Dkt. # 65) ¶ 3), and her eligibility was confirmed by an "Indian Health Services loan repayment person" (Pope Decl. (Dkt. # 71) ¶ 6, Ex. 5 ("C. Morlock Dep.") at 42:6-10). She states that she followed "all regulations put forth by the [Indian Health Service] LRP, including managing clinic and administration time, as was supported by [her] yearly reporting to [Indian Health Service] LRP." (*Id.*) These yearly reports required not only Dr. Morlock's signature, "but also the signature of three tribal employees[,] including an official time keeper, [her] supervisor, and human resources." (*Id.* ¶ 3, Ex. 1.)

In response to Individual Defendants' motion for summary judgment, Mr. Dahlstrom's theory of liability concerning this claim changed. He now asserts that because the Tribe hired Dr. Stephen Waszak, Dr. Morlock's employment "was not justified" and "was [a] misuse of federal resources." (Resp. at 11.) Mr. Dahlstrom adds that Dr. Morlock "was in [his] estimation not eligible for [LRP] as [the Tribe] ha[d] just recently retained the services of a medical doctor." (Dahlstrom Decl. ¶ 62.) Mr. Dahlstrom did not plead this new theory of liability in his complaint (*see* Compl. ¶ 16(b)); nor, as discussed above, did he raise it during discovery. For the same reasons as stated above, the court will not allow Mr. Dahlstrom to present new theories of liability on this alleged FCA claim in response to summary judgment. *See supra* § III.C.1.

More importantly, Mr. Dahlstrom cites no competent testimony or evidence that any false claim was made to the government regarding his LRP allegations. (*See* Resp. at 10-11 (citing Dahlstrom Decl. ¶¶ 44-47, Ex. 5).) His opinions regarding personnel mismanagement are insufficient. "It is not enough for [Mr. Dahlstrom] 'to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted.'" *See Kitsap Physicians Serv.*, 314 F.3d at 1002 (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). Mr. Dahlstrom "must show 'an actual false claim for payment being made to the Government.'" *Id.* (quoting *Clausen*, 290 F.3d at 1311). Accordingly, the court GRANTS Individual Defendants' motion for summary judgment on his claim concerning loan repayment obligations.[8]

3.  Dr. Morlock's Position with the Tribal Clinic

Mr. Dahlstrom claims in his complaint that Dr. Morlock "attempted (without success) to compel [him] to change [her] position (from a Council Approved Nurse Practitioner position) to Naturopathic Physician – full-time job posting." (Compl. ¶ 16(c).) He asserts that Dr. Morlock was appointed "to the position [of] Nurse Practitioner in 2014" and has been "working out of [the] scope of her employment and

//

//

---

[8] Further, even if Mr. Dahlstrom had evidence of the submission of a claim, he lacks evidence to show any claim was made fraudulently or that such a claim was material. *See Hopper*, 91 F.3d at 1267 ("Innocent mistakes, mere negligent misrepresentations and differences in interpretations" do not constitute knowingly false statements.").

lawful requirements of her license."[9]  (*Id.*)  However, in response to Individual

Defendants' motion for summary judgment, he now states that his concerns about Dr.

Morlock are limited to "his concerns that Dr. Morlock should not be approved for

ISDEAA funding" as stated in the previous claim.  (*See* Resp. at 11); *see also supra*

§ III.C.2.  He cites no additional evidence beyond the insufficient evidence cited in

support of the previous claim.  (*See* Resp. at 11.)  The court, therefore, GRANTS

Individual Defendants' motion for summary judgment on this claim on the same basis

that it granted summary judgment on the previous claim.

### 4. Alleged Vaccine-Related Issues

Mr. Dahlstrom asserts that Defendants used and wasted $90,000.00 in "spoiled"

vaccines.  (*See* Compl. ¶¶ 45, 75-82.)  He alleges that Defendants conspired "to conceal,

hold, or withhold Government property (i.e., 'spoiled' or 'damaged' or unused vaccines)

for extended periods of time to avoid responsibility or liability for authorizing [the]

administration of 'spoiled' or damaged' [sic] vaccines."  (*Id.* ¶ 79.)  He claims that

vaccines were wasted due to "chronic power outages, mismanagement, and no follow

through with policy or procedures."  (*Id.* at 25 n.34.)  He asserts that vaccines were

improperly "commingled," that they were held in unsanitary refrigerators, and that Dr.

Morlock was permitted to take some of the vaccines to her home for use at her private

clinic.  (Dahlstrom Dep. at 215:3-19.)

//

---

[9] Dr. Morlock was hired as a "Nuturopathic [sic] Doctor/Midwife" as of July 18, 2014, prior to Mr. Dahlstrom's appointment as the Tribe's interim HHS Director.  (6/6/19 Nedderman Decl. ¶ 15, Ex. 14.)

However, he acknowledges that he has no evidence that any of the vaccines were contaminated or compromised,[10] presents no evidence that a contaminated vaccine was used on a patient (*see* Resp. at 11-14), and admits he has no evidence of how many vaccines were wasted or spoiled.[11]  Although he testifies that Dr. Morlock told him, verbally, that she stored vaccines worth $30,000.00 at her home and private clinic (Dahlstrom Dep. at 215:13-216:5), he never saw any invoices or documents reflecting the value or number of vaccines despite his status as HSS Director (*id.* at 216:6-25).

Dr. Morlock testifies that she did not use tribal resources for her private gain, never took tribal vaccines for use in her private clinic, never administered or stored vaccines in her private practice, and never told Mr. Dahlstrom otherwise.  (Morlock Decl.

//

---

[10] Mr. Dahlstrom testified as follows:

Q:  . . . [M]y question is, do you have any evidence that any of the vaccines in that refrigerator that you opened and observed were contaminated in any way?
A:  I was not able to get from [Dr. Morlock], any information because she would – she would not provide it to me.
Q:  Okay.
A:  Because I did ask.
Q:  So the answer is no; correct?
A:  I don't have the physical evidence, no.

(Dahlstrom Dep. at 244:3-13; *see also id.* at 243:11-18 ("I don't have evidence that it was compromised . . . .").)

[11] Mr. Dahlstrom testified as follows:

Q:  . . . I am focused on vaccines that you believe were wasted or spoiled.  Do you have any evidence of how many vaccines were wasted or spoiled?
A:  I don't.

(Dahlstrom Dep. at 386:9-11.)

1  ¶ 4.)  She testifies that she did not waste any vaccines and never administered a

2  compromised vaccine.  (*Id.* ¶ 6.)

3        The portion of Mr. Dahlstrom's response related to this alleged FCA claim is

4  confusing, difficult to follow, and includes many erroneous record citations.[12]  He

5  appears to set forth a litany of vaccine-related issues, including vaccine-related

6  documents that are missing from Skagit County (not the Tribe or any other Defendant),

7  purported Health Insurance Portability and Accountability Act ("HIPPA") violations by

8  tribal employees other than the named Defendants, the transportation of vaccines

9  off-reservation for safekeeping during power outages or for use at Dr. Morlock's private

10  clinic to avoid waste, and Dr. Morlock's continued use of compromised vaccines

11  following power outages.  (*See* Resp. at 11-14.)  However, nothing in Mr. Dahlstrom's

12  response raises a triable issue of fact.

13        Despite his litany of allegations concerning tribal vaccines, Mr. Dahlstrom again

14  fails to identify—much less prove—a single false claim made to the government arising

15  from these issues.  His concerns relate to alleged mistakes or negligence, which

16  Defendants deny, but which do not—on their own—give rise to FCA liability.  *See U.S.*

17  //

---

18     [12] Mr. Dahlstrom devotes nearly three pages of single-spaced text in response to this
portion of Individual Defendants' summary judgment motion.  (*See* Resp. at 11-14).  This

19  portion of Mr. Dahlstrom's response violates the court's rules that pleadings must be
double-spaced and text must be 12-point or larger.  *See* Local Rules W.D. Wash. LCR 10(e).
Accordingly, he also violates that court's rule on the length of briefs.  *See id.*, LCR 7(e)(3).  In

20  addition, the record citations in this portion of Mr. Dahlstrom's response are largely nonsensical.
For example, he cites page 1,387 of his own declaration (*see* Resp. at 13), however, his

21  declaration, including exhibits, totals only 1,014 pages (*see generally* Dahlstrom Decl.).  Further,
the record citations contained in footnotes 28, 29, 30, 32, and 33 do not support the points Mr.

22  Dahlstrom makes in his response.  (*See* Resp. at 11-12.)

*ex rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Const. Co.*, 183 F.3d 1088, 1092 (9th Cir. 1999) ("Mere negligence and 'innocent mistake[s]' are not sufficient to establish liability under the FCA.") (quoting *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998)). Further, even if Mr. Dahlstrom had evidence of a single false claim or representation related to tribal vaccines, he has provided no evidence of Defendants' scienter. Accordingly, the court GRANTS Individual Defendants' summary judgment motion on Mr. Dahlstrom's FCA claim concerning vaccine-related issues.

     5.   <u>Alleged Payments to Dr. Ryan Johnstun (and Other Expenses)</u>

       Mr. Dahlstrom alleges that Ms. Metcalf "caused to be approved approximately $32,000.00" in illegal distributions of Contract Health Services ("CHS") funds.[13] (Compl. ¶ 16(e).) He enumerates one such payment in his complaint—an alleged $26,000.00 payment to a dentist that Mr. Dahlstrom says he refused to authorize in the fall of 2015. (*Id.* ¶¶ 37-38.) In his complaint, he alleges that Ms. Metcalf told him that this was "an emergency payment for dental care on behalf of enrolled tribal members," but the services were actually for "cosmetic-based dental care," for which the use of CHS funds is not permitted. (*Id.* ¶ 16(e) n.20.) In his deposition, however, Mr. Dahlstrom testified that the $26,000.00 figure was "for various patients." (Dahlstrom Dep. at

---

[13] CHS pays for "health services provided at the expense of the Indian Health Service from public or private medical or hospital facilities other than those of the Service." 42 C.F.R. § 136.21.

464:24-465:7.)  He further testified that the $26,000.00 figure encompassed all dental

care, rather than just cosmetic care.  (*Id.*)  He testified that he was "informed that no

dental care could be approved . . . for [CHS] monies," which he understood was "for just

medical care."  (*Id.* at 466:7-12.)  He admits that this is "why [he] put that claim out there

. . . ."[14]  (*Id.*)

Mr. Dahlstrom provides no further detail concerning these allegedly false

payments other than the above rough estimates.  Indeed, the only documentation Mr.

Dahlstrom provides in support of his claim is an unexplained and unauthenticated

breakdown of dollar amounts and specific providers.  (*See* Dahlstrom Dep. Ex. 19.)  That

sheet appears to attribute $11,196.05 to Darrington Dental and $6,755.54 to Dr. Johnstun.

(*Id.*)  The total of these figures is more than $8,000.00 less than the $26,000.00 Mr.

Dahlstrom discussed in his deposition.  Mr. Dahlstrom provides no explanation as to how

he calculated the $32,000.00 figure that appears in his complaint.  (*See generally* Resp.;

*see also* Compl.)

Defendants acknowledge that the Tribe received federal funding from CHS (now

"Purchased/Referred Care") to cover dental and other medical services for tribal

members that were not covered by insurance.  (Metcalf Decl. ¶ 5.)  Cosmetic dentistry is

---

[14] The testimony Mr. Dahlstrom provided in the declaration he filed along with his response to Individual Defendants' motion for summary judgment varied from both his complaint and his deposition testimony.  In his declaration, he states that although Ms. Metcalf ordered him to pay $32,000.000 of CHS funds to various vendors, he objected.  (Dahlstrom Decl. ¶ 85.)  He also testifies that he refused to pay $26,000.00 to Dr. Johnstun because "Dr. Johnstun lacked the vendor contract from which CHS funds . . . could be paid out."  (*Id.* ¶ 86.)  He states that he "steadfastly refused to sign the payment for Dr. Johnstun because he was lacking a vendor contract [and] some of the reimbursements he sought was for cosmetic dentistry which was prohibited by CHS funds."  (*Id.*)

not covered, but Ms. Metcalf declares that she has never allowed CHS payments for cosmetic dentistry.  (*Id.*)

    In his response to Individual Defendants' motion, Mr. Dahlstrom appears to base this claim on his alleged refusal "to [c]reate [Contract Support Costs ("CSC")] (False) Documents" for the period of fiscal years 2004 to 2013.[15] (*See* Resp. at 14-15 (bolding omitted).)  Mr. Dahlstrom did not plead these additional facts in his complaint.  (*See* Compl. ¶¶ 16(e), 38-39; *id.* at 22 n.28.)  Further, he cites no evidence in support of his allegations concerning CSC funds.[16]  The only evidence he cites in support of his allegations concerning CSC funds is found in footnotes 43 and 44 of his responsive memorandum.  (*See id.* at 15 nn. 43-44.)  Yet, the portions of the record cited in footnotes 43 and 44 do not relate to the use of CSC funds.  (*See id.* at 15 n.43 (citing Dahlstrom Decl. ¶ 94, which relates to the use of CHS funds for cosmetic dentistry and prescription glasses); *id.* at 15 n.44 (citing Pope Decl. ¶ 5, Ex. 4 ("Metcalf Dep.") at 56:2-3 (discussing whether the IHS required the Tribe to have a contract with an outside health care provider, such as Darrington Dental, to use CHS funds to pay the outside health care provider).)

//

//

---

[15] The ISDEAA authorizes certain CSC funding.  *See* 25 U.S.C. § 5325(a)(2).

[16] The portion of Mr. Dahlstrom's response devoted to opposing Individual Defendants' motion for summary judgment on this claim suffers from the same formatting infirmities as his response to the proceeding claim.  *See supra* § II.C.4.  He violates Local Civil Rule 10(a)'s requirements for double spacing and 12 point or larger type, and accordingly, he also violates the court's rule on the length of brief.  *See* Local Rules W.D. Wash. LCR 7(e)(3), 10(a).

On the other hand, Ms. Metcalf provides relevant testimony on this issue. She

testifies in her deposition as follows:

> Q: Do you recall any kind of request to have Mr. Dahlstrom put together
> financial documents related to health care reimbursements for a period of
> time of approximately 2004 to 2013?
> A: Say that again.
> Q: For some reimbursements for indirect contract costs of approximately
> one million dollars between the time period of 2004 to 2013?
> A: No. Indirect contract support cost is fixed during that time by IHS. So
> there would be no way to do anything other than what they provide to you
> for contract support costs [CSC]. So I am not sure where this going.

(Metcalf Dep. at 115:2-14.)

First, for the same reasons as stated above, the court will not allow Mr. Dahlstrom

to present new theories of liability on this alleged false claim in in response to summary

judgment. *See supra* § III.C.1. In any event, as noted above, Mr. Dahlstrom presents no

competent evidence in support of his revised theory of liability concerning CSC funds.

Accordingly, the court GRANTS Individual Defendants' motion with respect to Mr.

Dahlstrom's revised theory.

Moreover, the evidence that Mr. Dahlstrom provides in support of his claim that

dental or cosmetic dental expenses were improperly submitted and paid from CHS funds

is also insufficient to withstand summary judgment. Again, he fails to provide evidence

of the submission of a single false claim. *See Kitsap Physicians Serv*., 314 F.3d at 1002.

First, in his declaration, Mr. Dahlstrom testifies that he refused to authorize any payments

of CHS funds to Dr. Johnstun or for cosmetic dentistry. (Dahlstrom Decl. ¶¶ 84-86, 90.)

Even assuming such payments from CHS funds would be improper, Mr. Dahlstrom never

testifies that anyone submitted such a claim—only that he refused to authorize it. (*See*

*id.*)  In support of his argument, Mr. Dahlstrom also cites to Exhibit 19 of his declaration (*see* Resp. at 14 n.40), but that exhibit is nothing more than an unexplained list of dollar amounts and specific providers—two of which are Darrington Dentistry and Dr. Johnstun (*see* Dahlstrom Dep. ¶ 90, Ex. 19).  Mr. Dahlstrom describes the list as the Tribe's "CHS outstanding billings," but never explains what this means.  (*See id.*)  Nothing in Exhibit 19 provides evidence of a specific false claim.

In *Kitsap Physicians*, the plaintiff asserted that for ten years the defendants had submitted false claims to Medicare for medical services provided by the defendants.  314 F.3d at 998.  At summary judgment, the plaintiff submitted a 1987 letter from a deceased doctor stating that he had become aware that some of his bills "had been altered without his knowledge or consent," notes from and the deposition of the president of the physicians' group, and the plaintiff's recollection of statements made to him by the president of the physicians' group.  *Id.* at 1002.  The Ninth Circuit held that this evidence was insufficient to withstand summary judgment because it did "not describe even one, specific false claim."  *Id.*  The same is true here.

Even if Mr. Dahlstrom's evidence showed the submission of a claim, which it does not, he has provided no evidence that Ms. Metcalf had actual knowledge of, deliberately ignored, or recklessly disregarded the alleged fraudulent or false nature of these payments.  *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1477-18 (9th Cir. 1996).  At most, the parties dispute whether CHS funds may be used for dental costs. (*See* Mot. at 16 (citing *Hearing to Examine Access to Contract Health Services in Indian Country*, 110th Cong. 45 (June 26, 2008)) (prepared statement of Hon. Stacy Dixon,

Chair, Susanville Indian Rancheria) ("Under the CHS program, primary and specialty health care services that are not available at HIS or tribal health facilities are purchased from private and public health care providers. For example, CHS funds are used when a service is highly specialized . . . or cannot otherwise be provided due to staffing or funding issues, such as . . . dental . . . services."); *see also* 6/6/19 Nedderman Decl. ¶ 20, Ex. 19 (attaching copy of the Congressional statement).) Such legal disputes are "not enough to support a reasonable inference that [the claim] was *false* with the meaning of the [FCA]." *Hagood*, 81 F.3d at 1477. Nor does such evidence meet the scienter requirement of the FCA. *Id.* at 1478 (indicating that to take advantage of a disputed legal question "is to be neither deliberately ignorant nor recklessly disregardful") (quoting *United States ex rel. Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991)). Accordingly, the court GRANTS Individual Defendants' motion for summary judgment on this claim.

6. Alleged Investments in Tribal Gambling

Mr. Dahlstrom alleged that the Tribe expended $250,000.00 in the pursuit of tribal gaming, but "a decision was reached to disband . . . the Sauk-Suiattle Gaming Commission." (Compl. ¶ 16(f).) Mr. Dahlstrom concedes he has no evidence to support this claim. (*See* Resp. at 15 ("Plaintiff has no responsive information."); *see also* Dahlstrom Dep. at 467:25-468:5 ("I'm not certain [this claim is] viable, and I don't want to waste your time or my time trying to tell you that that would be a viable claim.").) Accordingly, the court GRANTS Individual Defendants' motion for summary judgment on this claim.

1       7.  <u>Community Natural Medicine ("CNM")</u>

2       CNM is a defunct Washington limited liability company governed by Dr. Morlock

3 and Mr. Morlock. (*See* 6/6/19 Nedderman Decl. ¶ 17, Ex. 16 (attaching the Washington

4 Secretary of State's business information form regarding CNM).) Dr. Morlock ran a

5 part-time private practice at CNM, focused primarily on women's health. (Morlock Decl.

6 ¶ 4.) Dr. Morlock declares that CNM did not provide any vaccinations; nor did it store

7 any vaccines. (*Id.*)

8       Mr. Dahlstrom's sole allegation against CNM is its purported taking of tribal

9 vaccines for private use. He asserts that the purported "commingling" of vaccines and

10 "other health-care resources" between the Tribe and CNM constitutes a false claim. (*See*

11 Compl. ¶ 74.) Nevertheless, Mr. Dahlstrom admits that he has "never personally been" to

12 CNM, does not know the value of vaccines allegedly taken there, does not know whether

13 the Tribe was reimbursed for the vaccines, does not know if the vaccines were about to

14 expire, and does not know the quantity of the vaccines allegedly transferred to CNM.

15 (*See* Dahlstrom Dep. at 341:1-342:20; 413:20-21.) Mr. Dahlstrom's claim is premised on

16 a statement by Dr. Morlock, which she denies, that Ms. Metcalf "allowed [Dr. Morlock]

17 to use [tribal vaccines] for her private use in her business," and that Dr. Morlock

18 estimated the value of the vaccines to be $30,000.00.[17] (*Id.* at 215:24-216:5; 413:13-19;

19 *see* Dahlstrom Decl. ¶ 51 ("Dr. Morlock admitted to me that she was allowed to take

20 some of the VFC stockpiles to her (CNM) business and (home) accordingly to store and

21

22       [17] In his declaration, contrary to his deposition testimony, Mr. Dahlstrom declares that Dr. Morlock estimated the value of the vaccines to be $90,000.00. (Dahlstrom Decl. ¶ 52.)

use VFC vaccines in her own business.").) Dr. Morlock denies that she took tribal vaccines to CNM, denies that CNM administered vaccines, denies that she told Mr. Dahlstrom that she took the vaccines to CNM, and denies that she estimated the value of any vaccines. (Morlock Decl. ¶¶ 4-5.)

Even if Mr. Dahlstrom's allegations were true, they do not create liability under the FCA for the same reason that Mr. Dahlstrom's other claims concerning the vaccines fail—he does not provide evidence of a single false claim presented to the government by CNM. *See Campie*, 862 F.3d at 898-99 ("[T]he false claim or statement must be the '*sine qua non* of receipt of state funding.'") (quoting *Ebeid*, 616 F.3d at 998). Accordingly, the court GRANTS Individual Defendants' motion for summary judgment on this claim.

       8.  <u>Summary</u>

The court GRANTS Individual Defendants' motion for summary judgment with respect to all of Mr. Dahlstrom's alleged false claims.

**D.    Washington Medicaid Fraud FCA**

The Washington Medicaid Fraud FCA imposes civil penalties for knowingly presenting a false or fraudulent Medicaid claim for approval to Washington State. RCW 74.66.020(1). A claim is defined as "any request or demand made for a Medicaid payment under chapter 74.09 RCW or other applicable law . . . ." RCW 74.66.010(1)(a). "Knowing" and "knowingly" are defined to include situations in which a person either has actual knowledge of the information or acts in deliberate ignorance or reckless disregard as to the truth or falsity of the information. RCW 74.66.010(7)(a).

In response to Defendants' interrogatory asking him for the "material facts" upon which he based his claim that Defendants violated the Washington Medicaid Fraud FCA, Mr. Dahlstrom stated the following in an unsigned response:

> In or around May through October (22), 2015, [Dr.] Morlock informed Plaintiff of her plan to bill the State of Washington (Medicaid fees) for administration of the VFC [Vaccines for Children] for tribal and non-tribal enrolled patients (on reservation or CNM), and additionally use her "hospital privileges" and enter treatment notes into patience charts that were in hospitals or on an outpatient basis (using an allopathic practitioner's medical license to serve as basis for seeking Medicaid reimbursements)–in order to generate additional Medicaid/Medicare based reimbursements for providing -in-person visits to patients at bedside despite the fact that she was informed that this activity would be fraudulent in nature. Further, Defendant [Dr.] Morlock also advised that she would be performing midwifery work on the Sauk-Suiattle Indian Reservation, would be utilizing the services of a doula and seek state or (federal) payments for performing childbirth related medical care and delivering babies on the reservation and/or alternatively at CNM. Additionally, Plaintiff is made aware of Defendant [Dr.] Morlock's efforts to compel payments from Medicaid –ostensibly under the guise that her services was provided by an allopathic service provider and supervision.

(6/6/19 Nedderman Decl. ¶ 16, Ex. 15 at 40.) Mr. Dahlstrom added nothing in support of this claim in his response to Individual Defendants' motion for summary judgment. (*See generally* Resp.; *see also* Reply at 10 (noting Mr. Dahlstrom's lack of response).)

Mr. Dahlstrom's unsigned and unverified interrogatory response is insufficient to raise a genuine factual dispute meriting trial. Federal Rule of Civil Procedure 33(b) states that interrogatories must be answered "in writing under oath" and "[t]he person who makes the [interrogatory] answers must sign them." Fed. R. Civ. P. 33(b)(3), (5). Mr. Dahlstrom failed to comply with this rule. (6/6/19 Nedderman Decl. ¶ 16, Ex. 15 at 71 (attaching unsigned verification page).) He had the opportunity to correct this error in response to Individual Defendants' motion for summary judgment (*see* MSJ at 18 (noting

that Mr. Dahlstrom's interrogatory responses were "unsigned" and "unsworn.")), but again failed to do so (*see generally* Resp.).  Accordingly, the court declines to consider his interrogatory response in opposition to Individual Defendants' motion.  *See Schwartz v. Compagnie General Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *Kincaid v. Anderson*, 681 F. App'x 178, 181 (4th Cir. 2017) ("Although interrogatory answers are appropriate materials for summary judgment purposes, Fed. R. Civ. P. 56(c)(1)(A), [the plaintiff's] responses here were not properly attested, and the district court did not abuse its discretion in refusing to accept them."); *Chen v. Shanghai Cafe Deluxe, Inc.*, No. 17CV02536 (DF), 2019 WL 1447082, at *10 (S.D.N.Y. Mar. 8, 2019) ("Where interrogatory responses are not verified, as required by Rule 33(b)(3) of the Federal Rules of Civil Procedure, they cannot be relied upon to oppose summary judgment.") (citing *Cavanugh v. Ford Motor Co.*, No. 13cv4584 (JS) (SIL), 2017 WL 2805057, at *7 (E.D.N.Y. June 9, 2017) (holding that unverified answers to interrogatories cannot "create a genuine issue of material fact that would allow Plaintiffs to survive summary judgment").

Because Mr. Dahlstrom fails to come forward with any competent evidence in support of his claim under the Washington Medicaid Fraud FCA, the court GRANTS Individual Defendants' motion for summary judgment and dismisses this claim.

**E.      Claims for Retaliation under the FCA and the Washington Medicaid Fraud FTA**

The federal and Washington statutory provisions governing retaliation claims under the FCA and the Washington Medicaid Fraud FCA, respectively, mirror one

another.  *Compare* 31 U.S.C. § 3730(h), *with* RCW § 74.66.090.  Although the court

found no Washington case interpreting RCW 74.66.090, numerous courts interpreting

similar state FCA provisions have repeatedly held that such state statutes are modeled

after or substantially track the federal FCA.  *See, e.g.*, *United States ex rel. Absher v.*

*Momence Medows Nursing Ctr., Inc.*, 764 F.3d 699, 704 n.5 (7th Cir. 2014) (stating that

Illinois false claims act "closely mirrors the [federal] FTC"); *United States ex rel. Thayer*

*v. Planned Parenthood of the Heartland*, 765 F.3d 914, 916 n.1 (8th Cir. 2014) ("Because

the FCA and the [Iowa] FCA are nearly identical, case law interpreting the FCA also

applies to the [Iowa] FCA."); *New York v. Amgen Inc.*, 652 F.3d 103, 109 (1st Cir. 2011)

("Given the substantive similarity of the state FCAs invoked here and the federal FCA

with respect to the provisions at issue in this litigation, the state statutes may be construed

consistently with the federal act."); *State v. Alius Fin., S.A.*, 116 P.3d 1175, 1184 (Cal.

2005) ("[T]he CFCA 'is patterned on similar legislation' and it is appropriate to look to

precedent construing the equivalent federal act.") (internal citation omitted).  Due to the

common language, and relatively paucity of judicial interpretation of many state FCAs,

federal courts have applied federal case law to numerous state FCAs.[18]  Mr. Dahlstrom

---

[18] *See, e.g.*, *Alius Fin.*, 116 P.3d at 1184 (California); *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 97 n.4 (D.D.C. 2011) (District of Columbia); *United States ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1033 n.5 (S.D. Fla. 2007) (Florida); *Cade v. Progressive Cmty. Healthcare, Inc.*, No. 1:09-cv-3522-WSD, 2011 WL 2837648, at *3 (N.D. Ga. July 14, 2011) (Georgia); *United States ex rel. Woodruff v. Haw. Pac. Health*, 560 F. Supp. 2d 988, 997 n.7 (D. Haw. 2008) (Hawaii); *Thayer*, 765 F.3d at 916 n.1 (Iowa); *United States ex rel. Humphrey v. Franklin-Williamson Human Servs., Inc.*, 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) (Illinois); *Thomas v. EmCare, Inc.*, No. 4:14-cv-00130-SEB, 2015 WL 5022284, at *2 n.2 (S.D. Ind. Aug. 24, 2015) (Indiana); *Scannell v. Att'y Gen.*, 872 N.E.2d 1136, 1138 n.4 (Mass. App. Ct. 2007) (Massachusetts); *United States v. Bon Secours Cottage Health Servs.*, 665 F. Supp. 2d 782, 783 n.2 (E.D. Mich. 2008) (Michigan); *Amgen*, 652 F.3d at 109 (New Mexico);

pleads no facts that distinguish his state and federal retaliation claims. (*See generally* Compl.)  Accordingly, the court looks to federal precedent for guidance and interprets and applies the state and federal statutory provisions concerning retaliation coterminously.

Individual Defendants contend that because they are not employers, they may not be held liable for retaliation under either the FCA or the Washington Medicaid Fraud FCA.  (*See* MSJ at 20-21, 22; Reply at 10.)  "[T]he overwhelming majority of courts . . . have held that the current version of [31 U.S.C.] § 3730(h) does not create a cause of action against supervisors sued in their individual capacities." *Brach v. Conflict Kinetics Corp.*, 221 F. Supp. 3d 743, 748 (E.D. Va. 2016) (citing *Howell v. Town of Ball*, 827 F.3d 515, 529-30 (5th Cir. 2016), and district court cases).  A 2009 amendment to the FCA removed the express reference to retaliatory acts committed by an "employer."  *See Howell*, 827 F.3d at 529.  However, examining "the changes to [31 U.S.C.] § 3730(h) as a whole," the Fifth Circuit concluded that Congress deleted the reference to an "employer," "not to provide liability for individual, non-employer defendants," but to broaden the class of FCA plaintiffs to include not only "employees," but "contractors" and "agents" as well.  *Id.* at 529-30.  The Fifth Circuit noted that prior to the amendment, federal courts uniformly held that the FCA created a cause of action against only a plaintiff's employer.  *Id.* at 530.  The Fifth Circuit concluded that Congress would not

---

*United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 816 (S.D.N.Y. 2010) (New York); *United States v. Planned Parenthood*, 21 F. Supp. 3d 831 n.24 (S.D. Tex. 2014) (Texas); *Ping Chen ex rel. United States v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 305 (S.D.N.Y. 2013) (New York).

have overturned this precedent by mere implication when it deleted the term "employer," but would have only done so by the insertion of express language expanding liability. *Id.* This court agrees with the Fifth Circuit's analysis[19] and, because the court looks to federal precedent to aid its interpretation of the Washington statute, GRANTS Individual Defendants' summary judgment motion on both Mr. Dahlstrom's FCA retaliation claim and his Washington Medicaid Fraud FCA retaliation claim.[20]

**F.      Attorney's Fees & Order to Show Cause**

Individual Defendants seek an award of attorney's fees under the FCA pursuant to 31 U.S.C. § 3730(d)(4) and under the Washington Medicaid Fraud FCA pursuant to RCW 74.66.070(d)(4).  Under both statutes, the court may award attorney's fees against Mr. Dahlstrom if his action "was clearly frivolous, clearly vexatious, or brought primarily for the purposes of harassment."  *See* 31 U.S.C. § 3730(d)(4); RCW 74.66.070(d)(4).

An action is "clearly frivolous" when the argument is wholly without merit, or when the result is obvious. *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1006 (9th Cir. 2000).  "An action is 'clearly vexatious' or 'brought primarily for purposes of harassment' when the plaintiff pursues the litigation with an improper purpose, such as to annoy or embarrass the defendant." *Id.* (citing *Patton v. Cty. of Kings*, 857 F.2d 1379,

---

[19] The court found no case authority from the Ninth Circuit on this issue.

[20] Individual Defendants also contend that they are entitled to summary judgment on Mr. Dahlstrom's retaliation claims because he lacks the fundamental evidence to demonstrate the elements of the claims and because the claims are barred by res judicata.  (MSJ at 19-20, 21-22.) Because the court concludes that Individual Defendants are entitled to summary judgment on the grounds discussed above, it does not reach these issues.

1381 (9th Cir. 1988). The Ninth Circuit "stress[es]" that the district court is required to "make detailed findings in support of any award" and that an award of such fees "is reserved for rare and special circumstances." *Id.* at 1006-07. This case is one such rare and special circumstance.

Mr. Dahlstrom failed to substantiate for purposes of summary judgment even one of his seven FCA claims. *See supra* § III.C.1.-8. Although establishing a false claim requesting payment is the "sine qua non" of an FCA claim, *see Campie*, 862 F.3d at 898-99; *see also Kitsap Physicians Serv.*, 314 F.3d at 1002, Mr. Dahlstrom failed to establish even this most elemental aspect of any of his alleged FCA claims. *See supra* § III.C.1-8. His FCA claims were based on little more than rumor and supposition. *See id.* Despite his managerial positions with the Tribe, hard facts and documentation in support of his claims were in short supply. *See id.* Indeed, despite his voluminous filings, his claims were supported by virtually no tangible evidence. *See id.* He provided no admissible evidence at all in support of his Washington Medicaid Fraud FCA claim. *See supra* § II.D. Based on this record, the court must conclude that his claims are frivolous.

Further, many of Mr. Dahlstrom's allegations against Individual Defendants are scurrilous and potentially damaging to their professional reputations. For example, in his responsive memorandum, Mr. Dahlstrom accused Dr. Morlock of "actively and serially injecting [the Tribe's] children, youth and families," and other patients, with "spoiled" and "expired" vaccines. (Resp. at 3.) Yet, he presented no evidence that any of the vaccines were contaminated or compromised or that any such vaccine was ever used on a

patient.  *See supra* § III.C.4.  Further, he argued that Individual Defendants should be liable for "their false claims act violations" not because they submitted false claims to the government, but rather because "they have threatened the very public policy mandates to protect the tribes [sic] vital resource, that is the protection of their most previous [sic] and vulnerable."  (Resp. at 22.)  Based on this record, and given the paucity of evidence in support of his FCA and Washington Medicaid Fraud FCA claims, the court also concludes that Mr. Dahlstrom's claims were clearly vexatious and brought for the primary purpose of harassing and embarrassing Individual Defendants.

Accordingly, the court GRANTS Individual Defendants' motion for an award of attorney's fees pursuant to both 31 U.S.C. § 3730(d)(4) and RCW 74.66.070(d)(4). Within fourteen days of the filing date of this order, Individual Defendants shall file a motion setting forth the reasonable fees and expenses they incurred in bringing their motion for summary judgment and conducting any necessary preceding discovery. Individual Defendants shall file and note their motion in accordance with the court's local rules.  *See* Local Rules W.D. Wash. LCR 7.

The court notes that, under 31 U.S.C. § 3730(d)(4), the court may only award attorney's fees against Mr. Dahlstrom and not his counsel.  *Pfingston*, 284 F.3d at 1006 ("The plain language of the False Claims Act does not indicate that fees may be awarded against an attorney. . . . In the absence of any indication that Congress intended a different result, we hold that the award of attorneys' fees against an attorney is not authorized by the False Claims Act.")  "Of course, an attorney may be liable for fees under separate authority, such as 28 U.S.C. § 1927."  *Id.* at 1006, n.5.  In addition, the

1    court may find an attorney liable for fees under Federal Rule of Civil Procedure 11(b),

2    *see* Fed. R. Civ. P. 11(b), or pursuant to its inherent authority, *see Fink v. Gomez*, 239

3    F.3d 989, 992 (9th Cir. 2001) ("[T]he district court has the inherent authority to impose

4    sanctions for bad faith, which includes a broad range of willful improper conduct.").

5        The court notes that this action would likely have been dismissed shortly after its

6    inception had Mr. Dahlstrom's counsel not appeared herein.  (*See* OSC; *see also* Not. of

7    Appearance.)  Further, Mr. Dahlstrom's counsel signed the responsive memorandum,

8    which contains the scurrilous and unsupported statements about Individual Defendants

9    noted above.  (*See* Resp. at 24.)  Accordingly, the court ORDERS Mr. Dahlstrom's

10   counsel, within 14 days of the filing date of this order, to show cause why the court

11   should not impose a portion of its attorney fees award, if any, against him personally

12   pursuant to 28 U.S.C. § 1927, Rule 11(b), or its inherent authority.  Individual

13   Defendants may also file a response to the court's order to show cause within the same

14   time limit.  The parties should limit their responses to no more than 10 pages.

15   **G.    Individual Defendants' Motions in Limine**

16       On August 26, 2019, Individual Defendants filed motions in limine.  (*See* MIL.)

17   In light of the court's ruling herein granting Individual Defendants' motion for summary

18   judgment, the court DENIES the motions in limine as MOOT.

19                      **IV.    CONCLUSION**

20       Based on the foregoing analysis, the court GRANTS Individual Defendants'

21   motion for summary judgment (Dkt. # 64) and DISMISSES Mr. Dahlstroms' complaint

22   WITH PREJUDICE.  The court also GRANTS Individual Defendants' motion for an

award of attorney fees pursuant to 31 U.S.C. § 3730(d)(4) and RCW 74.66.070(d)(4). Within fourteen days of the filing date of this order, Individual Defendants shall file a motion setting forth the reasonable fees and expenses described above and shall file and note their motion in accordance with the court's local rules.

In addition, within 14 days of the filing date of this order, the court ORDERS Mr. Dahlstrom's counsel to SHOW CAUSE why the court should not apportion part of its award of fees against him personally pursuant to 28 U.S.C. § 1927, Rule 11(b), or the court's inherent authority. Individual Defendants may also respond to the court's order to show cause within the same time limit. The parties shall limit their responses to the court's order to show cause to no more than 10 pages.

Finally, the court DENIES Individual Defendants' motions in limine (Dkt. # 77) as MOOT.

Dated this 29th day of August, 2019.

JAMES L. ROBART
United States District Judge